**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


SHIMBERLEE JIRON-KING,       )
                                    )      Civil Action No. 13 –176
               Plaintiff,     )
                                    )      Magistrate Judge Lisa Pupo Lenihan
v.                                       )
                                    )
INDIANA UNIVERSITY OF      )
PENNSYLVANIA,            )
                                    )
              Defendant.    )


**MEMORANDUM OPINION AND ORDER
ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**


**I.**       **Summation**

For the reasons set forth below, the Court concludes that Defendant's Motion for

Summary Judgment (ECF No. 32) will be granted.  The Court observes that the evidence of

record is sufficient to reasonably support findings that Plaintiff, Shimberlee Jiron-King

(hereafter "Jiron-King" or "Plaintiff"), who was employed for three (3) years as a

probationary tenure-track assistant professor in the Department of English at the Indiana

University of Pennsylvania (hereafter "IUP" or "Defendant"), experienced  throughout her

period of employment varying degrees of challenge as to her (1) teaching pedagogy in the

particular University context; (2) requisite participation in service to the University through,

*e.g.*, active committee roles; and (3) inclination/ability to respond to concrete

recommendations and directions/requirements from IUP regarding progress toward

fulfillment of each contractual component of her assistant professorship.  *See* Defendant's

Brief in Support of Motion for Summary Judgment ("Defendant's Brief in Support") (ECF No. 33) at 6 ("Throughout her employment at IUP problems were repeatedly observed and reported concerning [Plaintiff]'s teaching effectiveness, her service to the University, and her willingness to work to improve her teaching.").

The evidence is, conversely, insufficient to support a reasonable finding in her favor on any of Plaintiff's sole remaining claims, brought under Title VII of the Civil Rights Act of 1964 ("Title VII"). More specifically, no jury could reasonably find, on the evidence thoroughly reviewed by this Court, that Plaintiff was on account of her race or gender subjected to either intentional discrimination/disparate treatment or a hostile work environment (including, *i.e.*, sexual harassment). Plaintiff's Title VII claims fail because they either (a) lack evidentiary support and/or seek to raise fact questions not material to the cause of action, and/or (b) do not survive the <u>McDonnell-Douglas</u> burden-shifting analysis.[1] Plaintiff's diverse complaints are simply not reasonably linked to her race or gender (or any other protected category). Her accusations of "prejudice" or bias lack reasonably sufficient evidence and cannot ground a finding that, despite Defendant's substantial evidence of legitimate bases for IUP's ultimate termination of her employment, those bases were "pretextual".

## II.      <u>Relevant Factual and Procedural History</u>

---

[1] Under the familiar <u>McDonnell Douglas</u> shifting-burden analysis applicable to federal employment discrimination cases involving indirect proof of discrimination, the plaintiff bears the burden of proving a relatively simple *prima facie* case, which the employer must rebut by articulating a legitimate, non-discriminatory reason for its actions. *See generally* <u>Chipollini v. Spencer Gifts, Inc.</u>, 814 F.2d 893, 897 (3d Cir.1987). *See also* <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

## A. Factual History

The factual history as to which there is evidence of record is as follows:

Plaintiff is a Mexican American ("Latino") woman hired in Spring 2007 to a probationary full-time tenure track position as an Assistant Professor of English at IUP. *See* Defendant's Brief in Support, Ex. D-22 (Plaintiff's Deposition) at 30-31, 39 (Plaintiff was hired by IUP after sending out more than 50 applications and receiving no other job offers; she left a one-year probationary professorship at Claflin University). Plaintiff was interviewed and extended an offer of employment by a Hiring Committee that included the English Department Chair, Dr. Gail Berlin. Id. at 32. Plaintiff was hired to teach "a range of [IUP's] undergraduate English" courses as well as "Latino/a Literature . . . in the undergraduate major and the Graduate Program in Literature and Criticism (M.A. and Ph.D.)". Defendant's Brief in Support, Ex. D-3 (Position Announcement for English Faculty Position). That is, the record indicates that Plaintiff's familiarity with/ability to teach Latino literature was regarded as an asset in her hiring in that IUP hoped to broaden its English Department course offerings. *See, e.g.*, Plaintiff's Answer to Defendant's Concise Statement of Material Facts ("Plaintiff's Answer to Defendant's CSMF") (ECF No. 39) at para. 78 ("When Plaintiff was hired, . . . to even be considered for the position she had to express . . . an interest [in teaching Latino/a literature].");  Ex. D-11 (Plaintiff's second year Faculty Evaluation Report noting that she "was hired as a Latino/Latina scholar to join the Literature and Criticism graduate program as well as to teach undergraduate Liberal Studies and minority literature classes"); Ex. D-22, Plaintiff's Deposition at 34-35 ("They felt that the Latino population was growing there, and also that it was a very important part of American literature.").

Plaintiff's employment documents specifically set forth expectations for teaching, scholarship and University service/activities. *See* Ex. D-4 (June 18, 2007 employment contract offer specifying that Plaintiff's "primary responsibility is the development of a program of effective teaching, advising, and related professional activities", that she was "expected to engage in meaningful scholarship" and "to share [her] professional and intellectual talents in service activities to the university and, where appropriate, the community at large"); Ex. D-5 (Faculty Appointment Notice, noting that it was "understood that [Plaintiff would] participate in extracurricular activities of the University in the manner in which [her] qualifications warrant and to the degree that may be reasonably expected by the governing authorities."); Ex. D-6 (Collective Bargaining Agreement governing Plaintiff's employment) at 23 (identifying performance evaluation criteria as "1. Effective teaching and fulfillment of professional responsibilities", "2. Continuing Scholarly Growth", and "3. Service: Contribution to the University and/or community").

Her employment was covered by a collective bargaining agreement (a "CBA" or "Agreement") between The Pennsylvania State System of Higher Education and The Association of Pennsylvania State College and University Faculties. Pursuant to that Agreement, Plaintiff's appointment was for one-year terms subject to renewal by decision of the University's President (the "President" or "President Intenmann"), informed by observations, evaluations and written recommendations from (1) the Department's Evaluation Committee (the "DEC"), (2) the Department's Chair (the "Department Chair", "Chair Berlin", or "Interim Chair Pagnucci"), and (3) the Academic Dean of the College of Humanities (the "Dean" or "Dean Asamoah"). The DEC provided a written recommendation based on the classroom observations of members of the Department ("faculty peer observations"); the Department Chair made an independent classroom

4

observation and also provided a written recommendation; and the Dean also issued a written performance review and recommendation.  *See* Defendant's Brief in Support at 3; Ex. D-6.

Plaintiff began teaching classes during the Summer term (June, 2007), including a graduate course in "Topics in Minority Literatures: Contemporary Latina/o Literature in the U.S." <u>*See*</u> Ex. D-7 (Faculty Evaluation of Dr. Neinkamp).  A tenured professor and Department colleague, Dr. Susan Comfort ("Comfort"), offered to mentor her and suggested that Plaintiff put an "IUP Safe Zone" (or "LBGT") sticker (referring to sexual orientation support/nondiscrimination) on her office window (as several other IUP faculty, including Comfort, had done); Plaintiff declined.[2]  The Department Chair, Dr. Gail Berlin, and the Graduate Study Chair, Dr. Karen Dandurand, also recommended that Summer that Plaintiff have a mentor (to help her "learn the ropes", because a graduate student had made a complaint about Plaintiff).  They noted that Comfort had volunteered, and (in response to Plaintiff's question of whether mentorship was required) informed Plaintiff that mentorship was recommended but voluntary.  *See* Ex. D-22 (Plaintiff's Deposition) at 56-58; Complaint at 4 ("Plaintiff never agreed to the mentorship and never put the sticker on her window.").[3]

---

[2]  Plaintiff asserts that Comfort voiced her objection to Plaintiff's non-participation in "Safe Zone" office window stickers in Fall 2007.  *See* Complaint at 5.

[3]  The Court has encountered inconsistencies throughout Plaintiff's pleadings.  For example, Plaintiff alleges that in Fall 2007 Chair Berlin and Dr. Dandurand "pressured" her to have a mentor and "suggested" Comfort, but she declined.  *See* Complaint at 4; Plaintiff's Answer to Defendant's CSMF at para. 56 ("Plaintiff declined the offer of Dr. Comfort to become a mentor.").   In the record, Plaintiff uses the words "pressured" or "required" with regard to mentorship in reference to circumstances which she also asserts were presented as recommended but "voluntary" and "declined".   She fails to provide evidence that would support a reasonable finding that she was "pressured" to accept Dr. Comfort.  *Compare generally, e.g.*, Plaintiff's Answer to Defendant's CSMF at para. 66 (Plaintiff "was told that mentoring was not required") *with* <u>id.</u> at para.70 (Plaintiff "was the only one required to be mentored").  Similarly, while Plaintiff sometimes asserts that she was the only assistant professor to be assigned/pressured to

In her first academic year, Plaintiff moved with her husband and children from a residence near the IUP campus to the area of Cranberry, Pennsylvania, a distance of approximately one to one-and-one-half hours' drive. Ex. D-22 (Plaintiff's Deposition) at 47; *cf.* id. at 37-45 (Plaintiff's family initially rented an apartment in Indiana but moved to Cranberry Township; the relocation was related to unsanitary housing and better homeschooling opportunities, and unrelated to an incident between Plaintiff and her husband and the Indiana Township Police in late June regarding the former's public intoxication and, as to Plaintiff's husband, driving under the influence). *Cf. infra* n. 22.

Comfort expressed an open invitation to Plaintiff to stay overnight at her residence given that long-distance commute to/from Cranberry. *Cf.* Complaint at 5 (Comfort told Plaintiff she was welcome to spend the night at her home with Comfort and her female romantic partner); Plaintiff's Response at 9 (Comfort "offer[ed] twice to allow Plaintiff to spend the night in her home"). Plaintiff declined because Powers was in a domestic relationship with another woman. *See* Complaint at 5 ("Plaintiff found this invitation to be highly offensive.").[4]

---

accept (or even asked to have) a mentor, she fails to provide reasonable evidentiary support as to the mentorship of other assistant professors generally, or (more to the point) those similarly situated (*e.g.*, weak student evaluations; faculty/supervisor observation-identified teaching challenges; consistent annual review specifications regarding requisite improvements in job performance). *Cf.* Ex. D-22 (Plaintiff's Deposition) at 140 (asserting that "no other probationary faculty were ever asked or required, from my knowledge – and I did ask others about their status with regard to that – no one else was ever asked or pressured that way"); discussion *infra* & n. 14.

To the extent Plaintiff seeks to premise a Title VII claim on IUP's requirement that she be a collegially-engaged and responsive member of the English Department, and address identified teaching weaknesses through several avenues (*see* discussion *infra*) including feedback from and observation of effective colleagues, no such claim would fall within its scope.

[4] *Cf.* Defendant's CSMF at para. 54 (stating that Plaintiff alleged that in 2007 Comfort invited Plaintiff to stay at her home overnight if she was ever too tired to drive the 60-90 minutes

In accordance with the terms of her employment contract, Plaintiff was annually evaluated for renewal based on her teaching, scholarship, and service to University. *See supra*, Ex. D-6 (CBA). Her first annual performance review record indicates that she was observed by several Department colleagues who were generally positive and supportive in their reports.[5] Plaintiff acknowledges that she received a positive formal peer recommendation from Comfort during her first year. *See* Plaintiff's Answer to Defendant's CSMF at para. 34; Ex. D-22 (Plaintiff's Deposition) at 62; id. at 144 (Dr. Comfort was Plaintiff's "first-year evaluator" for the DEC and "recommend[ed] that [Plaintiff] be retained"); s*ee also* Defendant's Brief in Support at 6, 13 (citing Plaintiff's Deposition testimony).

Plaintiff was also observed by Chair Berlin who documented concerns regarding Plaintiff's clarity and organization as to syllabus and class content, Plaintiff's method of grading, students' non-engagement during class, and some unusually low scores in student evaluations.

---

to Cranberry Township, and Plaintiff alleges she found this offensive because Comfort was a lesbian living with a partner); Plaintiff's Answer to Defendant's CSMF at para. 54 (denying as stated, asserting that record leaves material fact question as to Comfort's ascribed reason). *But compare* Ex. D-22 (Plaintiff's Deposition) at 164 (testifying that Plaintiff felt "sexually harassed" by Comfort when Comfort "said that since my drive was so long, that if I ever felt like spending the night at her house, I was welcome to do so").

Plaintiff makes no Complaint allegation that Comfort voiced objection or displeasure at Plaintiff's declining her offer of accommodation. *Compare supra* n. 2 (alleging Comfort objected to Plaintiff's non-participation in office window stickers). Plaintiff makes no allegation that Comfort made any statement or action of a sexual nature toward, or in any way expressly solicited a sexual relationship with, Plaintiff. Cf. Ex. D-22 (Plaintiff's Deposition) at 61 (Plaintiff experienced no "problems with anybody who [she] felt was discriminatory towards [her] for any reason" that Fall semester).

[5] Classroom observations were made by Department faculty including Dr. Kate McClenahan and Dr. Christopher Kuipers who provided generally positive reviews. *See* Ex. D-7 (Faculty Evaluation recommendation of Dr. Neinkamp, noting same but also noting that Plaintiff would "need to address" certain "areas of her teaching as she makes the transition to a new teaching environment" such as "timely feedback on student work" and "clearer overall instruction").

Dr. Berlin provided specific suggestions and directions in her report and meeting with Plaintiff. *See* Ex. D-8 (Chair's Observation and Evaluation, including observation notes and request that Plaintiff work with Dr. Sue Welsh, Director of Liberal Studies English, to develop a written teaching improvement plan, which might include working with the Center for Teaching Excellence, becoming active in a reflective practice group, and being observed informally by colleagues for feedback or observing some of IUP's best teachers in action). Plaintiff's first year student reviews identified similar areas of concern.[6] Although Plaintiff received unanimous recommendations from the DEC; the Department Chair, Dr. Gail Berlin; and the Dean for first year renewal of her employment contract, she was expressly advised that she needed to address the identified concerns. *See* Ex. D-9 (Dean Asamoah's recommendation, noting teaching weaknesses identified by "weak student evaluations", Plaintiff's "difficult start as a teacher at IUP", and concerns regarding, *e.g.*, disorganization, lack of clarity, and delayed return of examinations); id. (noting, as another area of concern, that Plaintiff failed to respond to the Dean's invitation to meet to discuss her student evaluations).

The records of Plaintiff's second annual performance review, for the academic year Fall 2008 through Spring 2009, indicate that she was again recommended by the DEC.[7] The DEC

---

[6] More specifically, Plaintiff's student evaluations indicated that approximately one-half of her students identified "lack of clarity" as an area of concern, 55% indicated they would not take her course again, and approximately three-quarters indicated delayed examination returns. *See* Ex. D-9, *infra*.

[7] Plaintiff was observed teaching an upper-level course, Topics in American Literature from 1870, by faculty member Dr. Susan Gatti, whose report noted Plaintiff's disorganization and lateness to class, unclear objectives, and a need to encourage more group (as opposed to particular students' responses) and facilitate more class interaction. She recommended strategies to improve teaching effectiveness such as a different room arrangement for this graduate seminar, more orientation to the day's focus, and purposefully helping students connect theory and applied critical responses to the texts. *See* Ex. D-11 (DEC Faulty Evaluation Report for

Report (as signed by Plaintiff and the co-chairs, including Dr. Jean Neinkamp) expressly

concludes, however, that while Plaintiff "has achieved some degree of success in teaching [in the

Latino/Latina literature] field on the graduate level", her "record of teaching undergraduate

classes, especially Liberal Studies classes, has presented serious concerns to the DEC . . .

because of mixed peer observations and student evaluations."  The DEC recommended that

Plaintiff "take advantage of IUP's supportive organizations for teaching excellence."  It also

---

second year, noting same); Ex. D-12 (Chair's Second Year Observation and Evaluation); Ex. D-20 (Gatti's Faculty Observation Report, noting that "students did not appear to open books or to discuss text", needed practice connecting "theoretical concepts to texts under discussion", and to interact/discuss rather than have "instructor's voice . . . predominate").  Plaintiff was also observed by Dr. Chauna Craig, who found that in Plaintiff's Humanities Literature class "very few [students] appeared to be engaged", students "didn't know how to situate their thinking"/lacked context, and they had "little developed explication" of the material.  Dr. Craig was herself unclear as to some of Plaintiff's objectives/purposes.  She recommended Plaintiff try "alternative teaching methods to engage students more and make them accountable for their own learning", but noted that the class dynamic may have been hampered by the presence of a graduate student observer video-taping the lesson.  An additional peer observation was therefore scheduled.  See id.; Ex. 19 (Craig's Classroom Visitation Report).  Dr. Anthony Farrington observed that Plaintiff fostered a congenial and enthusiastic climate but needed to present her objectives more openly, "foster more discussion, encourage extended critical depth, and more enthusiastic participation from additional students."  And Dr. Christopher Kuipers observed that much of the class was taken up with the viewing of a film, but also provided a generally favorable written report.  See id.  Cf. Plaintiff's Answer to Defendant's CSMF at para. 19 ("Much like Dr. Gatti's observations, [Dr. Kuiper's] at best constituted positive and negative criticism designed to be a constructive aid for advancing goals in teaching.").

The DEC's Faculty Evaluation Report also summarizes Plaintiff's second year student evaluations, which indicate that she was more successful with students in her upper level/theory classes (93% above average/superior) than with undergraduate/non-major students (an average in those two classes of 49% above average/superior).  The students also indicated primary areas of concern as – consistent with the prior year – improving/clearer communications (e.g., assignments and grading policies), and availability.  See id.

Finally, the Report observes that new faculty are essentially allowed an adjustment period during their first year, after which they are expect to become involved in Departmental committees and activities; it notes Plaintiff's membership in the Department Evaluations Committee, Program for Majors Committee and Graduate Program in Literature and Theory Committee.  See id.

recommended that she "develop some connections to the university . . . and ways to provide valuable service", noting that Plaintiff "obviously needs to put much more emphasis on this". *See* Ex. D-11 (DEC Faulty Evaluation Report for second year).

Despite numerous expressed concerns, Plaintiff was also recommended by the Interim Department Chair, Dr. Gian Pagnucci.[8] *See* Ex. D-12 (Chair's Second Year Observation and Evaluation). More specifically, Pagnucci observed Plaintiff's classroom and reviewed her faculty and student evaluations in detail. He noted that he found Plaintiff's class room presentation at times confusing/hard to follow/disconnected; that Plaintiff had timeliness shortcomings as to her syllabus, examinations and responsiveness to student communications; tardiness to her own class; and that she missed Graduate program meetings. He reiterated the prior year evaluation concerns that Plaintiff encourage more general class discussion and place the focus of the class "on students' own active learning." Id. His review of the student evaluations reflected (again, akin to the prior years' evaluation) undergraduate course (Eng. 101/121) ratings of 50% average, 26% above/average/superior, as opposed to a 100% score of above average/superior for her graduate course (Eng. 762); and identified primary areas of weakness in communicating effectively and timeliness (with 73% of undergraduate course students disagreeing/strongly disagreeing that Plaintiff was timely). His review of the second year faculty peer evaluations elaborated on their "mixed" nature. *See* id., *supra* n. 7. Interim Chair Pagnucci also specifically noted (1) Plaintiff's continuing need to expand her service work, and (2) that Plaintiff failed to provide the written teaching improvement plan which the Chair directed the previous year, and that this would have to be completed by Plaintiff's third year evaluation. Id. Nonetheless, in light of Plaintiff's express representations regarding her

---

[8] Dr. Gail Berlin was on academic sabbatical that year.

intentions to work on and provide her written Teaching Improvement Plan, meet with colleagues regarding her pedagogy, and participate in the Reflective Practices Group, he recommended contract renewal. *See* Ex. D-12 ("I believe improving in these areas is within [Plaintiff]'s abilities if she applies herself diligently . . . ."); *see also* Defendant's Brief in Support at 8-9.

Dean Asamoah, however, recommended non-renewal of Plaintiff's contract. *See* Ex. D-13 (Dean's Memo to Plaintiff of Probationary Second-Year Evaluation). Although her student evaluation ratings had improved, his evaluation cites to continuing problems with lateness, disorganization, and inattentiveness to her professional responsibilities. *See* Ex. D-13 (referring to "persistent problems" and "teaching difficulties" still reflected in student evaluations and "signaled by her peers", and stating that she had failed to meet department standards and "did not avail herself of the resources and opportunities available to support her teaching"). *Cf., e.g.*, Ex. D-22 (Plaintiff's Deposition) at 74-75 (Plaintiff thought Dr. Gatti's evaluation was "very helpful" but did not follow up after her evaluation to work with her on achieving any of the suggestions laid out); *supra* n. 7 (discussing Gatti's peer observation report). President Intenmann reviewed the recommendation materials and renewed Plaintiff's employment contract.

The records of Plaintiff's third annual performance review, for the academic year Fall 2009 through Spring 2010, indicate that Plaintiff received unfavorable recommendations from the DEC (co-chairs Dr. Jean Neinkamp and Dr. Jeanine Fontaine), Chair Berlin, and Dean Asamoah. President Intenmann did not renew her contract. Plaintiff was formally informed by letter of January 28, 2010 and her employment at IUP terminated effective June 4, 2010. See Ex. D-18 (President's Letter of Termination).

More specifically, the documents of record indicate that the DEC's initial draft evaluation was prepared based on information in the personnel file sent to the sub-committee in charge of probationary tenure-track assistant professors. *See* Complaint at 5.[9] In its consideration of Plaintiff's annual review, the Evaluation Committee became aware of faculty members' objections to some content of the evaluation. For example, Dr. Laurel Black objected that, despite Plaintiff's written representations to the Committee regarding active membership, her attendance at Reflective Practice Group meetings (in which Dr. Black was an active member) was at best limited/sporadic and without preparation. *See* Defendant's CSMF at para. 44 (citing Record); *cf.* Ex. D-22 (Plaintiff's Deposition) at 87-88 (recalling that Dr. Black was the leader of the Reflective Practice group, but unable to recall Dr. Black's first name, or any other members of the group, or how many times/how frequently Plaintiff herself attended). Similarly, Dr. Heather Powers advised that, despite her representations, Plaintiff did not attend meetings of the Programs for Majors Committee (in which Powers was an active member). Id.; *see also* Ex. D-26 (Kuipers Deposition) at 41 (Plaintiff "did not attend the meetings of the Programs for Majors Committee" of which he was a member). Additional records of Plaintiff's employment period were requested. *See* Complaint at 5; *supra* n. 9.

---

[9] *See also* Defendant's Brief in Support at 10, Ex. D-6 (CBA) at 25 (identifying materials to be used in DEC evaluation as student evaluations, peer evaluations, updated copy of the *curriculum vita*, and any other data submitted by the faculty member under review or "which the department evaluation committee may deem pertinent"). *Compare* Ex. D-22 (Plaintiff's Deposition) at 170 (Powers "pulled all three years" of Plaintiff's materials but that was not "proper departmental procedure" and "the secretary there said it was very strange that they pulled all of my materials from my file . . . because the letter was supposed to be based only upon the material of that year").

Following further discussion,[10] the majority of the DEC voted to recommend nonrenewal of Plaintiff's contract, and the writing of her final DEC evaluation was undertaken by Dr. Ben Rafoth.  *See* Defendant's CSMF at 34 (noting DEC co-chair Neinkamp's deposition testimony that Rafoth wrote final DEC evaluation); Ex. D-23 (Neinkamp Deposition) at 30-33 (Rafoth revised evaluation report because after discussion the committee felt "the original draft of the evaluation didn't meet [their] sentiments", with the primary complaint being that the original draft "didn't reflect what we felt . . . the problems were with her teaching"); *cf.* id. at 60 (every draft DEC evaluation submitted to the DEC by a member of the department has been altered or changed).[11]  The DEC noted Plaintiff's failure to utilize offers of assistance from

[10] Plaintiff asserts that she and other probationary faculty members were asked to leave the meeting and that this was against DEC procedures.  *See* Complaint at 6.  The record indicates that the DEC was advised of the inappropriateness of permitting non-tenured professors to be present during probationary professors' reviews/evaluation determinations.  *See* Ex. D-23 (Neinkamp Deposition) at 52-56 (relating that the DEC revised evaluation procedures to better follow the CBA and avoid conflicts of interests in individuals present for/participating in evaluations, such as their own or their spouses; when the Union president became aware that un-tenured faculty were members of the Evaluation Committee, it was determined they should not be, as they are subject to annual evaluations). *Cf.* Ex. D-22 (Plaintiff's Deposition) at 157-159 (Plaintiff was on the Evaluation Committee from her first year, but "four of the faculty members" – who were "all probationary members" - were, when "it was time to do the voting", "kicked out of an important meeting ongoing over . . . evaluation letters", which "was not a part of proper departmental procedures").  This does not constitute, particularly in light of the record, a material question of fact.

[11] *Compare* Complaint at 6 (asserting that Neinkamp told Plaintiff Comfort prepared the final draft of her DEC evaluation); Plaintiff's Answer to Defendant's CSMF at para. 50 (admitting that Plaintiff alleges "Comfort rewrote Plaintiff's third year evaluation and Plaintiff thus received a negative evaluation and recommendation of non-renewal of her employment by the DEC motivated by an intent to discriminate against her because of her ethnicity and gender"); Ex. D-22 (Plaintiff's Deposition) at 144 (asserting that Comfort rewrote Plaintiff's "final DEC evaluation") *with* Plaintiff's Answer to Defendant's CSMF at para. 31 (denying that "Plaintiff asserts that Dr. Susan Comfort wrote her final negative evaluation from the DEC" and stating that substance of Plaintiff's testimony "suggest [sic] that Dr. Comfort used internal influence to foil Plaintiff's employment"); id. at 34 (denying as stated because the record "does not support the contention that Dr. Comfort 'had nothing to do with drafting and writing it' because Comfort

colleagues who "had brought problems with her teaching effectiveness to her attention at various times" or to follow through with the Center for Teaching Excellence; to address inadequate syllabi and clarity of communication problems regarding her classes; or to "demonstrate the [expected] quality of active service". *See* Ex. D-15 (Department of English Yearly Evaluation 2009). In addition, in reviewing Plaintiff's materials, the Department was concerned that the improvement in Plaintiff's student evaluation scores appeared (by reference to the changed/comparative scores in particular subcategories of the evaluations, *e.g.*, comparative workload vis-à-vis other courses) related to Plaintiff's lowering of her course expectations. *See* id.; *see also* Ex. D-16, *infra* (Chair's Observation and Evaluation, providing detailed charts of student evaluations, and noting increase in percentage of students expecting an A from 36% to 87% (*i.e.*, a 51% increase), and corresponding 41% decrease in student assessments of workload); Ex. D-23 (Neinkamp Deposition) at 79-82 (explaining preference, in Neinkamp's experience at IUP, of "liberal studies"/non-English major students, for required courses with significantly less workload – and related relevance to assessment of Plaintiff's student scores). *Cf.* Ex. D-22 (Plaintiff's Deposition) at 135-136 (quotation from Plaintiff's letter to Dean Asamoah regarding his "stubborn, ignorant approach to [Plaintiff's] file" and noting that "[a]s

---

and others' complaints were involved in the adverse decision). *Cf.* Ex. D-22 (Plaintiff's Deposition) at 163 (testifying that Comfort was on the DEC committee Plaintiff's first and third years). *Compare* id. at 162-63 (Plaintiff believes her DEC evaluation was rewritten by Heather Powers because Comfort "decided that [the first draft written by Resa Bizzarro] was too good") *with* discussion *supra* (regarding Powers' objections to Plaintiff's representations regarding her participation on committee).

As discussed at length herein, Plaintiff fails to provide reasonable evidence supportive of her alternative allegation (*i.e.*, that Comfort used internal influence to foil Plaintiff's employment for reasons of race/gender discrimination or sexual harassment), and Defendant provides significant evidence of legitimate bases for its employment actions.

anyone would logically conclude . . . the students' low estimation of me in the beginning was based on their disdain for the considerable academic expectations I brought to the institution").[12]

Chair Berlin's third year recommendation, consisting of six (6) pages, notes her classroom observations, review of student and peer evaluations, and continuing "serious concerns" consistent with those expressed in her first year observation/recommendation, *e.g.*, Plaintiff's poor class management, lack of clarity/transitions, questionable understanding of some material, and shortcomings in teaching skills in literary analysis. *See* Ex. D-16 (Chair's Observation and Evaluation). The evaluation also notes concerns regarding "thin syllabi", and the concerns revealed by a break-down of Plaintiff's student evaluation scores, particularly in light of Dr. Berlin's class observations (*see supra*). Dr. Berlin's report states that the "student comment sheets" requested from Plaintiff by Dr. Berlin were not provided, and identifies specifics illustrative of Plaintiff's very "mixed" faculty peer reviews. *See* Ex. D-16 (including discussion of problems - such as "classroom management", nature of assignments, and facilitation of "whole-class discussion" - identified by Drs. Gatti, Craig and Downing). And it notes Plaintiff's failures to actively engage in mentoring/professional guidance with several colleagues who had expressed willingness to help her. *See* id. (describing indications of Plaintiff's minimal investment in opportunities "to improve her undergraduate teaching"). Dr. Berlin points out that both she and Interim Chair Pagnucci had directed that Plaintiff provide a written Plan for Improving Teaching, and yet Plaintiff still had not submitted a Plan. And finally, Dr. Berlin notes Plaintiff's representations of work on internships for

_____

[12] *Cf.* Plaintiff's Answer to Defendant's CSMF at para. 59 (noting Dean's evaluation indicates that 46% of students rated Plaintiff as "superior"); Ex. D-22 (Plaintiff's Deposition) at 120-21 (Plaintiff's first began to suspect criticisms of her classroom organization and teaching skills were pretextual based on the interpretation given to her improved student scores).

English majors, but failure to provide/"share" any of her work/information garnered, and her "minimal" participation in the one committee on which she and Dr. Berlin both served.  *See* id.

Plaintiff alleges that Chair Berlin's recommendation of non-renewal of her contract at this juncture was based on racial prejudice evidenced by Dr. Berlin's expressed objection to Plaintiff's having taught (during Dr. Berlin's sabbatical the previous year) Latino literature for her undergraduate course in American Literature.  *See* Defendant's Brief in Support at 6 ("Dr. Berlin preferred that the Undergraduate Course in American Literature in the U.S. feature canonical American Literature."); Plaintiff's Answer to Defendant's CSMF at para. 41 (admitting same).  *Compare* Plaintiff's Answer to Defendant's CSMF at para. 68 ("Plaintiff testified that Dr. Berlin stated she would never have allowed Plaintiff to teach an American literature class devoted to Latino literature."); Ex. D-22 (Plaintiff's Deposition) (Berlin objected to Plaintiff's devoting her undergraduate class in "American Literature in the United States" to Latino literature) *with*  Complaint at 4 (Plaintiff was told by Berlin "that she could not teach Latina/o Literature and that she had to teach American Literature"); Plaintiff's Answer to Defendant's CSMF at para. 42 ("After Dr. Berlin expressed displeasure about Latino Literature, Plaintiff testified she was very confused.").[13]

---

[13]  A statement that an assistant professor employed to teach general undergraduate literature courses as well as courses in Latino literature should not devote her undergraduate/lower level "American Literature" course offering to Latino literature is not, of course, akin to a statement that the professor may not teach Latino literature.  As reflected in the extensive recounting of facts of record above, Plaintiff was hired in part to teach, and was in fact teaching with Dr. Berlin's knowledge and approval, courses in and including Latino literature. *See infra*.  The record before this Court cannot support a reasonable finding of racial prejudice on the part of Dr. Berlin.

Moreover, Plaintiff's own testimony has also been that she does not know why Dr. Berlin gave her a negative recommendation her third year, and that it may have been a result of Dr. Berlin's jealousy of Plaintiff's superior scholarship, *i.e.*, Plaintiff's testimony is that she is

Dean Asamoah's Probationary Third –Year Evaluation, in recommending against renewal of Plaintiff's employment, similarly notes "nagging questions" about the changes in her student evaluation scores and concerns expressed in her faculty peer observations. *See* Ex. D-17. It concludes that "[f]or three years in a row, doubts have been raised about [Plaintiff]'s teaching effectiveness [and in the Dean's] judgment, she failed to show how she has responded . . . I cannot recommend her reappointment." Id. *Compare* Plaintiff's Answer to Defendant's CSMF at para. 45 ("Plaintiff testified that she stopped writing an improvement plan because Dr. Neinkamp told her it was unnecessary as a result of rising scores.") *with* id. at para. 22 ("Plaintiff testified that she did not develop a plan because student scores went up and 'it didn't seem to be an issue'.").

In March, 2010, Plaintiff filed an Equal Employment Opportunity Commission (the "EEOC") Charge of Discrimination under Title VII (cross-filed with the Pennsylvania Human Relations Commission (the "PHRC")), asserting race and gender discrimination.

**B. Procedural History**

In February, 2013, Plaintiff filed her Complaint in this Court, the content of which is largely a verbatim recitation of her EEOC Charge. She alleged a series of false, discriminatory and unobjective evaluations from the DEC, Department Chair and Dean. *See* Complaint at 5. Although her Complaint initially included claims under the PHRA and 42 U.S.C.A. Section

_____

speculating. *See* Plaintiff's Answer to Defendant's CSMF at para. 61("Plaintiff testified that Dr. Berlin harbored prejudice against her in some way"); Ex. D-22 (Plaintiff's Deposition) at 129-130 (Plaintiff believes Berlin "was prejudice[d against Plaintiff's] ability to perform . . . as a professional"); id. at 134 (Plaintiff doesn't "know what [Berlin] was thinking" or whether her behavior toward Plaintiff was motivated by prejudice towards gender, heterosexuality, maternal status, or race); *see also* Defendant's Brief in Support at 6 (noting same).

1981, in June, 2013 Plaintiff did not oppose dismissal of all but Count I (the Title VII claims). *See* ECF No. 14 (Notice of Non-Opposition to Defendant's Motion to Dismiss Counts II and III). Currently pending is Defendant's Motion for Summary Judgment (ECF No. 32). Plaintiff's Response in Opposition ("Plaintiff's Response") argues that her Title VII claims should proceed based on (1) evidence of racial prejudice of Dr. Gail Berlin, the Department Chair, based on her objection to Plaintiff's comprising her undergraduate course in American Literature of Latino literature; and (2) evidence of sexual harassment based on "what [Plaintiff] believed to be" sexual advances by Comfort, which Plaintiff declined. *See* Plaintiff's Response at 1-2. Although not referenced in her Preliminary Statement, the remainder of her Response also asserts a basis of (3) evidence of gender discrimination premised on her gender and/or her heterosexual orientation.

### III.    Underline[General Applicable Standards on Summary Judgment]

Summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). All evidentiary inferences are drawn and all doubts resolved in favor of the non-moving party. *See* Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, (1986). The moving party has the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. The party opposing the motion, however, cannot rely merely upon bare assertions, conclusory allegations, or suspicions to support her claim; she "must do

more than simply show that there is some metaphysical doubt as to the material facts," Matsushita, 475 U.S. at 586, and must produce more than a "mere scintilla" of evidence to demonstrate a genuine issue of material fact. *See* Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir.1992). *See also* Celotex, 477 U.S. at 324 (observing that Rule 56(e) permits a summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves).

A motion for summary judgment will not be defeated by the mere existence of some disputed facts. *See* Anderson, 477 U.S. at 247–48. The inquiry to be made is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." The non-moving party "must be able to produce evidence that 'when considered in light of that party's burden of proof at trial, could be the basis for a jury finding in that party's favor.'" SEC v. Hughes Capital Corp., 124 F.3d 449, 452 (3d Cir.1997) (quoting Kline v. First W. Gov't Sec., 24 F.3d 480, 484 (3d Cir.1994)). If the non-moving party fails to present evidence sufficient to establish an "element essential to that party's case, and on which that party will bear the burden of proof at trial", summary judgment is appropriate. Celotex, 477 U.S. at 322.

## IV. Analysis

### A. Disparate Treatment

The Court observes that the *prima facie* elements of a claim of disparate treatment under Title VII, 42 U.S.C. Section 2000e, are that the plaintiff: (1) is a member of a protected class; (2) was qualified for the position she sought to attain or retain; (3) suffered an adverse employment action; and (4) was treated less favorably that similarly situated persons not members of her protected class or that the action occurred under circumstances that could give rise to an

inference of discrimination. *See, e.g.*, <u>Makky v. Chertoff</u>, 541 F.3d 205, 214 (3d Cir. 2008); <u>Sarullo v. USPS</u>, 352 F.3d 789, 797 (3d Cir.2003). Plaintiff may satisfy her initial burden of proof by offering direct evidence of discriminatory intent (*e.g.,* evidence of conduct or statements by persons involved in the decision making process, related to that process, and directly reflecting the alleged motivation), or may indirectly demonstrate such intent under the <u>McDonnell Douglas</u> framework. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Under the indirect method, where Defendant counters with legitimate nondiscriminatory reasons for its actions, Plaintiff must then show that those reasons were pretextual. <u>Id.</u> at 751; *see also* <u>Fuentes v. Perskie</u>, 32 F.3d 759 (3d Cir.1994); <u>McKenna v. Pacific Rail Service</u>, 32 F.3d 820, 825-826 (3d Cir. 1994) (observing that, under the Supreme Court's decision in <u>Hicks</u>, "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, and that discrimination was the real reason") (emphasis in original).

It is on the fourth criteria that Plaintiff's case clearly fails, for Plaintiff has not produced evidence sufficient to reasonably support a finding either that (a) similarly situated individuals who were not Latino, or who were not women, were treated differently or (b) the circumstances support an inference of racial or gender discrimination.

Plaintiff has principally proffered her own speculation; she proffers no evidence that reasonably similarly situated individuals were treated more favorably. She had problematic peer evaluations, student reports, and annual reviews at several levels. She was supported and offered assistance and suggestions, including, *e.g.*, specific guidance on how to work with large class sizes (*cf.* Ex. D-22 (Plaintiff's Deposition) at 116 (discussing Dr. Downing's class observation of "mixed results" and specific recommendations for how to keep students involved in large classes), and considerations regarding courses for undergraduate non-majors. The evidentiary

record of her employment at IUP indicates leniency with regard to Plaintiff's first year teaching and service, and attempts by Department members and superiors to guide and support her professional development (including through IUP's Center for Teaching Excellence and/or participation in a faculty Reflective Practices group). *Compare* Plaintiff's diverse assertions that offers/suggestions of assistance and mentorship constitute evidence of race or gender discrimination.[14]

As to any inference of racial discrimination, this Court observes that the evidence of record is that Plaintiff was interviewed and hired by a Committee that included Dr. Berlin, and that her hiring was expressly related to IUP's desire to offer courses in Latino literature. *See* discussion, *supra*. Her race did not change during her three years in the Department, other circumstances did. Plaintiff makes no factual allegation of racial bias other than the alleged prejudice of Dr. Berlin attributed to the latter's objection to Plaintiff's undergraduate course offering in "American Literature" being devoted to Latino Literature. *Compare* Plaintiff's Response at 10 (asserting, as essentially sole response to Defendant's Motion for summary judgment on her race-based claim under Title VII, that when "Berlin found out that Plaintiff was teaching

_____

[14] The significant question of whether *not* offering mentorship (time spent by colleagues in professional feedback, guidance, recommendations, and assistance in meeting the diverse requirements of a new teaching position) to other individuals constitutes treating them *more* favorably notwithstanding, Plaintiff fails to provide reasonable evidence that Caucasian and/or male probationary faculty were (a) not pressured to be mentored or (b) similarly situated. And, as noted *supra* n.3, Plaintiff's allegations notwithstanding, she varyingly asserts that mentorship was required but voluntary, that it was mandatory but declined. *See* Complaint at 4 (asserting that Caucasian probationary faculty were not "pressured to be mentored"); Ex. D-22 (Plaintiff's Deposition) at 120 (asserting that mentoring "was really not a requirement for most of the other new faculty"). *Cf.* Ex. D-26 (Kuipers Deposition) at 22-23 (Kuipers had a mentor when he joined IUP and, while there was no formal mentoring assignment, "there was a very clear sense" that new faculty would try to be connected with senior faculty members, and "it was never required because it was, or should have been, obvious to anyone new that this was a very valuable thing" as mentoring "is sort of how the field regenerates itself"); id. at 23-24 (Kuipers knows of no new or probationary mentor who didn't use or want a mentor).

Latino/a literature, she told Plaintiff she would never have approved it") *with* Plaintiff's Answer to Defendant's CSMF at para. 68 (Dr. Berlin's evaluation was prejudiced because she "stated she would have never allowed Plaintiff to teach an American literature class devoted to Latino literature").

The Court observes the absence of an evidentiary indication that Dr. Berlin, or any other faculty member or administrator, objected to Plaintiff's offering courses in Latino literature; quite to the contrary, the record indicates those offerings were a significant, favorable consideration in Plaintiff's employment. The Court also notes, in addition to Plaintiff's insufficiency of evidence, and sometime mischaracterization of the record as to the scope and substance of Dr. Berlin's alleged objection, Plaintiff's own testimony that she doesn't know why Dr. Berlin gave her a negative recommendation or was prejudiced against her, and that it may have been attributable to professional jealousy. In light of the other facts of record detailed extensively above, including Defendant's evidence related to Plaintiff's annual assessments, the record is patently insufficient to support a reasonable finding in Plaintiff's favor.[15]

---

[15] *Cf. e.g.*, Ex. D-22 (Plaintiff's Deposition) at 77-78 (Asamoah, an African American, never gave Plaintiff any indication he had a racist bias against Plaintiff or anyone else, nor did he indicate any bias to Plaintiff's knowledge against heterosexuals, married individuals, or those with children); id. at 111 (Plaintiff has no idea why Asamoah was motivated to give Plaintiff a negative recommendation; Plaintiff does not know if there was anything discriminatory in his motivation; that was never suggested to her).

*Cf. also* id. at 92-94 (neither Dr. Neinkamp nor Dr. Lea Masiello, who was co-chair of the DEC for Plaintiff's second evaluation and a married woman with children, expressed any bias towards Plaintiff's race or lifestyle status); id. at 97-98 (Dr. Pagnucci, interim Chair for Plaintiff's second evaluation, gave Plaintiff no indication he was prejudiced by her race, and Plaintiff does not know if he knew she was married, or had children, or her sexual orientation); id. at 112-114 (Dr. Intemann gave no indication of any animosity toward Plaintiff's race or heterosexual status; Plaintiff does not know if he knew she was married or had children).

As to any inference of gender discrimination: Plaintiff acknowledges that allegations of disparate treatment/discrimination because of sexual-orientation are not actionable under Title VII. *See* Bibby v. Philadelphia Coca-Cola Bottling Co., 260 F.3d 257 (3d Cir. 2001); Plaintiff's Response at 9. Thus, to the extent her pleadings allege – expressly or by inference – that she suffered adverse employment actions/conditions (in a University Department comprised significantly of women, several of whom were apparently in positions of administrative leadership, some of whom did not share her sexual orientation) because she was a married, heterosexual mother – those allegations (even if Plaintiff had proffered reasonable evidence of heterosexual animus, which she has not) cannot ground her remaining claims. *See, e.g.*, Ex. D-22 (Plaintiff's Deposition) at 49 (Plaintiff felt there was "discrimination by members of the faculty or administration based upon the fact that [she is] a heterosexual woman with children"); Plaintiff's Answer to Defendant's CSMF at para. 71-72 (asserting, as "Counter Statement", that she was "attacked by University officials" because she "could not adapt to the Defendant's 'culture'", as exemplified by, *e.g.*, her refusal to "put a sticker on her window for gay solidarity"); Ex. D-22 (Plaintiff's Deposition) at 141 (same).[16] To the extent Plaintiff alleges that she suffered adverse actions/conditions because she is a woman, as amply demonstrated by the factual history *supra*, the record simply cannot support a reasonable finding in her favor.

---

[16] *See also, e.g.*, Complaint at 6 (Plaintiff's allegation that some members of the DEC sub-committee "regarded the fact that she was married with four children"); Plaintiff's Answer to Defendant's CSMF at para. 33 (admitting her allegation that Comfort wrote Plaintiff's negative third year final DEC evaluation because Comfort was prejudiced against "a heterosexual married woman"); id. at para. 39 (citing Plaintiff's deposition testimony that "Dr. Berlin expressed 'shock' when she found out that Plaintiff was married (by virtue of seeing her husband)"); Ex. D-22 (Plaintiff's Deposition) at 80-82 (recounting, more fully, that Berlin "seemed surprised to see [Plaintiff's] husband there" when Plaintiff was making photocopies in her office one evening, but didn't say anything); id. at 90 (Berlin never otherwise expressed/demonstrated any animosity due to Plaintiff's heterosexual or parental status).

**B. Hostile Work Environment/Sexual Harassment**

Finally, to the extent Plaintiff alleges that she was subjected to a hostile work environment/sexual harassment and/or retaliatory adverse employment actions/conditions by a lesbian colleague seeking a sexual relationship/favors (conduct which would be actionable under Title VII), here again the record simply does not reasonably support any such claims.

As Plaintiff sets forth in her Response in Opposition, "In order for a plaintiff to establish a *prima facie* case for sexual harassment under Title VII, [she] must show (1) the employee suffered intentional discrimination because of [his or her] sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of *respondeat superior* liability." Plaintiff's Response at 3 (quoting Bonenberger v. Plymouth Township, 132 F.3d 20, 25 (3d Cir. 1997)).[17]

However offensive Plaintiff found Comfort's offer of accommodation,[18] she proffers – for a start - no evidence that it arose from any improper motivation (as opposed to a colleague's consideration for Plaintiff's potential fatigue/the danger of a long drive between two long school

---

[17] *See also* id. at 4 (noting that the factors to be considered in determining whether sexual harassment is "pervasive" include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating. . .; and whether it unreasonably interferes with . . . work performance") (quoting Ullrich v. United States Secy. of Veterans Affairs, 457 Fed. Appx. 132, 140 (3d Cir. 2012)).

[18] *Cf.* Plaintiff's Response at 9 (suggesting that Comfort's "subtle advances" be labeled "white collar" sexual harassment and that Comfort's conduct was "no different in substance" than such "outward conduct" as "grabbing [or] touching").

days[19] and/or during inclement weather), or that Comfort ever solicited any sexual interaction with Plaintiff, or that the offer was repeated at any time during Plaintiff's subsequent two teaching years at IUP. Indeed, Plaintiff's own evidence is to the contrary. See *supra* n. 4 (citing Ex. D-22 (Plaintiff's Deposition) at 164 (testifying that Plaintiff felt "sexually harassed" by Comfort when Comfort "said that since my drive was so long, that if I ever felt like spending the night at her house, I was welcome to do so")); Ex. D-22 at 165 (testifying that Comfort's offer of accommodation was made a second time later in that year, either Fall of 2007 or Spring of 2008, but not repeated after that).[20]

Similarly, Plaintiff has failed to proffer reasonable evidence of record that *either* (a) her non-participation in officer sticker displays of non-discrimination/acceptance of alternative sexual-orientation and/or (b) "offense" at Comfort's accommodation offer *caused* any adverse effect on Plaintiff's employment circumstances. Plaintiff acknowledges that Comfort's offer and request were not repeated beyond Plaintiff's first academic year, and that she received favorable DEC recommendations for continued employment her first and second academic years). *See supra.*

---

[19] *Cf.* Ex. D-22 (Plaintiff's Deposition) at 105-106 (testifying that she was teaching full time and in her office more than 40 hours per week for student meetings as well).

[20] *Cf.* Plaintiff's Response at 8 (stating, as essentially her full response to Defendant's Motion on this aspect of Plaintiff's claim that: "It is somewhat undisputed that Dr. Comfort made advances to Plaintiff . . . she found to be inappropriate."); Plaintiff's Answer to Defendant's CSMF at para. 80-81 (Plaintiff "felt sexually harassed" by Comfort because she was invited to spend the night at her residence). *Compare* Plaintiff's Answer to Defendant's CSMF at para. 62 (asserting that Comfort "pressured Plaintiff for reasons a reasonable jury could find to be a violation of Title VII").

The question of whether Plaintiff would feel sexually harassed by the same invitation, under the same circumstances - and *sans any* factual allegation of sexual speech or conduct - from a heterosexual male or female colleague with a domestic partner aside, her allegations and the evidence of record are simply insufficient for a reasonable finding of hostile work environment arising from sexual harassment under Title VII.

Moreover, Plaintiff (a) acknowledges that Comfort herself provided a positive DEC evaluation of Plaintiff during her first year[21] and (b) presents no reasonably sufficient evidence that Comfort adversely influenced subsequent employment decisions because Plaintiff rebuffed sexual advances.[22]

## C. Pretext

---

[21] *See* discussion and citations, *supra*. *See also* Ex. D-22 (Plaintiff's Deposition) at 145 (answering, in response to question of why Comfort recommended Plaintiff, as her first-year evaluator to DEC, "even after [Plaintiff] said [she didn't] want to be mentored by [Comfort or] put up the sticker", that "[t]here was no evidence to not recommend me at that point").

[22] *See* discussion and citations, *supra*. *Compare* Plaintiff's Answer to Defendant's CSMF at para. 34 ("Neinkamp testified that [Comfort's] complaints (along with two other individuals) were involved in the adverse employment action taken by the Defendant") *with, e.g.,* extensive discussions of record, *supra*, regarding faculty reports of Plaintiff's non-participation in committees listed in her CV materials subsequent to IUP's requirement that she more actively participate in service to the University and numerous DEC concerns documented in Plaintiff's employment record.

*Compare* Ex. D-22 (Plaintiff's Deposition) at 171-72 (Neinkamp told Plaintiff she was very upset after committee meeting and left crying, "things that were said were not right", and Neinkamp signed non-recommendation "holding her nose", but Plaintiff has no information as to what occurred) *with* Ex. D-23 (Neinkamp Deposition) at 102-03 (Neinkamp was upset because the ultimate non-recommendation of Plaintiff by the DEC was a "contentious process" and she wished "it hadn't had to happen); id. at 105-07 (prior to first DEC meeting on Plaintiff's evaluation, Neinkamp did not know that several people, including but not limited to Black, Rafoth and Comfort, had strong feelings about Plaintiff's "really slacking off on the job" and not trying to improve). *See also* Ex. D-26 (Kuipers Deposition) at 13-14 (recounting procedure at DEC meeting, in which copies of draft evaluation are circulated and people on committee can look at file and say if they think information was missed or misinterpreted); id. at 14-15 (relating that Dr. Black was "very frustrated . . . because [Plaintiff] had claimed to be attending . . . Reflective Practice, of which Dr. Black was in charge, and Plaintiff "had never come to a meeting"); id. at 25, 29 (Dr. Black's raising the issue of Plaintiff's misrepresentation was one reason why Plaintiff's draft evaluation came under question and needed further review, and ultimately was rewritten); id. at 30-31 (testimony, under direction to answer deposition question despite reluctance, that evaluation discussion included "some irrelevant gossipy sort of conversation, which is unseemly for professors" and "was shut down rather quickly", but included statements regarding Plaintiff's failing to attend/canceling classes and "maybe [drinking] too much").

As reflected in the extended discussions above, the evidence of record strongly supports Defendant's assertions that Plaintiff's teaching and necessarily-related administrative skills, interpersonal/student relationships, her ability to accept and respond to professional critiques and IUP's requirements for specific written planning and modifications in the performance of her job, as well as the extent of her participation on committees and general fulfillment of her broader service role, were legitimate, recurringly-noted factors in her annual performance reviews and ultimate termination.

V.     **Conclusion**

In sum, the evidence that Plaintiff presents in support of her allegations of actionable misconduct under Title VII does not reasonably support either (a) that race or gender-based discriminatory intent, rather than other factors, motivated the alleged adverse employment action(s); or (b) that Plaintiff was subjected to sexual harassment by her Department colleague, Comfort. While the record contains evidence of Plaintiff's myriad employment complaints, it does not reasonably evidence any potential finding of disparate impact or hostile work environment under Title VII.  Indeed, to the contrary, the record indicates that Plaintiff (a) experienced significant effective teaching and class management, materials/organizational/timeliness challenges; (b) was offered/suggested and rejected/largely failed to pursue mentorship opportunities/alternative teaching method guidance with multiple colleagues;[23] (c) elected to live 60 to 90 minutes' drive from the IUP campus, was teaching a full course load and holding substantial office hours throughout the school year, but found the offer

---

[23] *Cf.* Ex. 22 (Plaintiff's Deposition at 242 (explaining that her refusal to accept a mentorship and "that kind of authority immediately over [her]" was problematic); id. at 140 (explaining that the "mockery" Plaintiff "received from Gail Berlin . . . was really ironic because the truth of the matter was that [Plaintiff is] a master teacher")).

to stay over night at the residence of a Department colleague (who was in a domestic-partner relationship) offensive and - in itself -sexually harassing; (d) was unsure why the Department Chair, Dr. Gail Berlin, was critical of her in class observation and evaluation reports , but felt that Dr. Berlin was "prejudiced" against Plaintiff owing to Plaintiff's superior scholarship or because she objected – owing to racial bias - to Plaintiff's decision to comprise her undergraduate course in American Literature of Latino literature; (e) in accordance with the deficits identified in her first year review and the specific steps for improvement set forth therein, represented that she would develop a written plan, but failed to do so because it seemed to Plaintiff herself, and on the basis of remarks by other individuals (not those with ultimate employment decision-making authority, or those who had expressly required the plan for her third year retention, and to whom she had agreed to provide it), that it was not necessary because her student scores improved; and (f) continued to under-participate in other non-teaching, contractually-required duties, such as service on Departmental/University committees, despite representations that she would address this in response to prior annual evalution(s).

Plaintiff alleges, but fails to provide evidence or Title VII relevance of, many things.  And Defendant, in response, proffers a three-year history of classroom observations and recommendations from many colleagues, and written annual performance reviews highlighting areas of concern and requiring specific responsive performance (including a written plan and increased University service) for continued employment. Plaintiff's contentions and evidence of record are thus insufficient to maintain a reasonable inference of disparate treatment/discrimination, sexual harassment, and/or pretext, or a jury question of any liability to Plaintiff on the part of IUP under Title VII.  *Cf. generally* <u>Goodall-Gaillard v. New Jersey Dept.</u>

of Corrections , 2014 WL 2872086,  (D.N.J.  2014) (granting summary judgment on insufficiently evidenced Title VII claims).

## VI.     Order

**AND NOW,** after due consideration of Defendants' Motion for Summary Judgment (ECF No. 32), **IT IS HEREBY ORDERED** that said Motion for Summary Judgment is **GRANTED.**

The Clerk of Courts is directed to mark this case as closed.

Dated:  February10, 2015

_____
Lisa Pupo Lenihan
United States Magistrate Judge

Cc:     Counsel of record